of America, et al. Ms. Gamow for the appellants, Ms. Hagley for Appley United States of America, and Ms. Benitez for individual defendant Appleys. I'd like counsel to be advised that Judge Henderson will consider these cases today based on the audio recording of the argument, which makes it particularly important to be sure to speak into the microphone. Good morning, and may it please the Court. My name is Carly Gamow. With me are Julian Fortuna and Abigail Sutherland on behalf of Plaintiff's Appellants, 38 conservative grassroots organizations. Plaintiff's claims in this case are well summarized in a recent opinion in the related Sixth Circuit case of United States v. NorCal Tea Party Patriots. Writing for a unanimous court, Judge Kethledge recognized that among the most serious allegations a federal court can address are that an executive agency has targeted citizens for mistreatment based on their political views. Plaintiffs have alleged precisely such mistreatment in an ongoing targeting scheme, through which defendants targeted their tax-exempt applications, intentionally delayed them, and demanded such information as their donor names, their positions on issues of importance to the organizations, and the political affiliations of their officers and directors. Some, if not all of the plaintiffs' applications have been approved? No, Your Honor, there are two who are suffering delay from this over five years after their applications were submitted. I would certainly speak to the mootness question, if there's still ongoing on that. Thank you. Well, Your Honor, that's absolutely correct. Certainly, they cannot be moot claims. And we would submit that even those that have been granted, because of the allegations in the Second Amendment complaint, that this is an ongoing targeting scheme, whereby these groups were identified based on their political viewpoints, essentially rounded up and branded by the IRS for life. There is ongoing monitoring, and it is alleged that there is... What does monitoring mean? I'm sorry, Your Honor? What does monitoring, speaking to the microphone, what does monitoring mean? Well, Your Honor, I think we're going to need discovery to know precisely what the contours of monitoring... What do you mean by monitoring? What we mean by monitoring is that they are continuing to watch these organizations and potentially will audit them. We are aware now, there are developing facts that unfortunately were not available at the time that we filed the complaint or the motion to dismiss decision was made. But in other case, in the related case, there's discovery that demonstrates that these organizations are being subjected, they're on the list for review of operations. And that's not something they would ever know on their own without discovery. So unfortunately, there's a lot of information that's still in the hands of the government on which discovery is necessary. And these claims simply are not moot. What do you have in the second amended complaint that tells us this? Paragraph four of the second amended complaint alleges that there is ongoing monitoring, that despite the public apologies, the outward face of this, we're so sorry this happened, that there is an ongoing scheme, that there is continued monitoring of these organizations. We also allege in paragraph 315 that there is a chilling effect on the speech and association of these organizations. That is an ongoing harm from this targeting scheme, your honors. And the mere suspension until further notice of a single component of this scheme, and I think it's important that we be clear here, BOLO lists per se are not the problem. It's the criteria that were used and placed on the BOLO list that identified and targeted for mistreatment based on political views. That's the problem here. And there has been absolutely no showing that those criteria are no longer in effect. The IRS itself has said nothing to that. So it's simply untenable to say that these claims are moot because of the suspension until further notice. And the standard is it has to be absolutely clear that this conduct cannot reasonably be expected to recur, and the effects have to be completely and irrevocably eradicated. That is a formidable burden that the IRS simply has not met here. It wasn't asked to me, and this also is extremely important. The path forward report that the district court took judicial notice of was issued and had been on the government's website for six months at the time that the motion to dismiss was filed. The government itself did not think that the statements in the path forward mooted their case. They didn't raise that argument. What they did was they latched on to the district court's decision and now have effectively tried to turn this into a judicial notice case, which it simply isn't. Of the two applications that are pending, one or both, are they C-3s or C-4s? Those are C-4s, Your Honor. Both are C-4s. Yes, Your Honor. So there's no C-3 pending? Not still awaiting. Still suffering harm, yes, but not still awaiting a determination. Well, suffering harm alone does not necessarily prevent mootness. What is it we're supposed to do that fixes, for example, any chill you might feel? Your Honor, there are... There are hundreds of ways in which you can still feel harm in a case could be moot. Certainly, Your Honor, but here it's the specific effects of this... What are we supposed... what is a court supposed to do about that? Your Honor, I believe what the district court should do is order that... well, let me say it this way. It certainly is not moot unless and until, at a minimum, there is an amendment to the C-4 regulation, which these plaintiffs have alleged is precisely what allows this kind of targeting to go on, this viewpoint-based targeting. In fact, TIGTA found as well that that standard is not clearly defined, and so the vagueness in that has to be amended at a minimum. The individual... I mean, if you're correct that the law is that they can't do it, then that seems a very good argument, that they can't do it, they can't use viewpoint discrimination. Why do you need something that says... our regulation here says we're going to follow the law. Does that really fix anything that isn't already? Your Honor, I... If this were already fixed, would you... Right. Your Honor, I believe that a declaration and an injunction from a federal court will significantly deter this from happening again. And in these circumstances, the IRS has obfuscated and obstructed at every turn. They've not let Congress in on what's going on here. They've not been producing discovery in other cases. This clearly is not the conduct of an agency that intends for this type of targeting, which it's in litigation not admitting even happened. It's not the conduct of an agency that has permanently ceased this type of targeting. So there clearly has to be, in addition to the amendments to the C-4 regulation, they need to enshrine an absolute prohibition against viewpoint-based discrimination in the Internal Revenue Manual. That has not happened here. There's not a single piece of evidence that there has been an Internal Revenue Manual amendment that addresses the political viewpoint-based discrimination. Their position is that that would be in order, and they apparently believe that that has happened here. But when you look at 7.20 of the manual, which they cite, but of course don't actually give you the information, the information therein simply does not meet the voluntary cessation test for mootness. In the event that it is individual defendants who are responsible for the alleged unlawful targeting, as opposed to an agency policy, this is precisely the egregious yet still very narrow context in which a Bivens remedy should be available. And I also think that it's important to note this court in Munsell made it very clear that if the government's unconstitutional conduct drives a plaintiff from the regulated arena and moots, for example, its APA claims, that that would weigh heavily in favor of a Bivens claim. There are four C-4 plaintiffs that are in precisely that situation. They withdrew, and their allegations are they withdrew their applications solely because of the unconstitutional targeting and said, we don't want to be subjected to this anymore. So the only relief for them would be a backwards-looking damages claim. This may be unfair to ask you to pass on the other side's argument, but I want to see if you understand it the same way I do, and I may be making it a little more specifically than they are, that the progeny of Bivens counsels courts that the primary responsibility for creation of remedies lies not with the courts but with the legislature, that the careful about implying remedies, that is to say, then, that the court should be reluctant to expand the scope of Bivens. One of the things we ought to consider is whether Congress has acted. Now, not just whether Congress has acted to create a remedial scheme that assists the claimant, but also one that excludes the claimant could indicate that Congress intended that there not be such a Bivens remedy. Do you understand that to be the government's argument? I do, Your Honor. What I would say in response to that is the cases where a claimant has been excluded, the courts have made it very clear, though, that the code still addresses the conduct. Congress may have decided that not all individuals who are subjected to this type of conduct will have a remedy in the code. Our position, and I think it's abundantly clear, is viewpoint-based discrimination and targeting, such as has been alleged here, is nowhere contemplated within the Internal Revenue Code. And with good reason, because Congress has spoken to this issue and said, we understand that there are Bivens claims available. And in these egregious contexts of constitutional violations... So when you said Congress, that was the senator who was shepherding the bill through, correct? It was. But it was included by unanimous consent in the congressional record. And so we believe that that gives it more weight. But the inclusion in the congressional record is not an enactment, Your Honor. No, it's not an enactment. It certainly is not. But it's similar to the Carlson case in which they looked at the legislative history. Not an enactment, but they just looked at the legislative history and what had been said by the senators there, by the congressman there, which was that they intended to preserve those remedies. Now, again, it's not a magic language test. They don't have to say, we intend to preserve. But it's very clear from the legislative history that they understood Bivens claims to be available against individual IRS officials, and that they were then enacting a taxpayer bill of rights so that there would be rights and remedies against the government for other types of claims. So we certainly do believe that this is a situation in which, again, particularly for those who have been driven from this arena by the success of the unconstitutional conduct, that the only relief that they can get for a years-long targeting scheme would be these backward-looking damages claims. Finally, I think there's no question that the district court misunderstood and misinterpreted the Section 7431 claims of these plaintiffs. They did not plead merely that the means by which their return information was obtained was improper, but also that subsequently it was improperly inspected because it was not for tax administration purposes. It certainly was not required. And they knew that when they asked for it, which actually makes it similar to the cases where it's not just that the mechanism, say the levy, is improper, and thus they try to piggyback and say, well, the disclosure therefore is also improper. No, no. We have alleged here that both the means by which that information was obtained and the subsequent handling, inspection, disclosure, were improper and in violation. And who did the inspecting? Who did the disclosure? And to whom? Well, that's a question that we need to... You don't know anything about that? We don't know. That's in the hands of the government. That's why we believe, as the NorCal court said, we should be permitted to take discovery. It may be a difficult burden, but we certainly think we passed the threshold to get to discovery on that issue. Your Honor, I presume... Is there anything other than, well, when you say disclosed, you're talking about disclosed within the department? No. We actually allege that personal e-mails were being used to disclose information. We don't know what information. We don't know specifically which of the plaintiffs, but we are aware that information was being disclosed using personal e-mails to other individuals. We don't know whether it was only inside the IRS or outside the IRS. Again, all of this information is information to which we are entitled to find out in discovery. We simply don't know all the facts. But again, certainly believe that the misunderstanding and misinterpretation needs to be corrected here, Your Honor. I'd like to reserve the last two minutes for rebuttal. Thank you, Your Honor. Good morning, may it please the Court. I'll first address the District Court's mootness TIGTA found serious problems with the IRS's procedures for processing tax-exempt applications, and the plaintiffs brought suit claiming that those procedures violated their personal rights. The District Court determined that it lacked jurisdiction over that constitutional claim because the procedures had been changed and TIGTA's recommendations for correction had been adopted. Can you tell us specifically what's been done to prevent recurrence? And if you're going to go on mootness, which is a little strange with two claims still outstanding, but if you're going on mootness, does it not have to be viewed under whether it's capable of evasive review and it's capable of repetition? Yes, Your Honor. TIGTA has confirmed in its 2015 report that all nine of its recommendations for the corrections that needed to take place have been taken place, including... Which report is that? This is TIGTA's 2015 confirming report. It's a follow-up to the 2013 report that was attached to... Is it the March 27, 2015 report? Yes, the March 2015 report. Well, that says that guidance that was to have been published has never been published. That is correct. TIGTA had recommended that the IRS advise Treasury that guidance should be issued, and the IRS did that. And it hasn't been done? It hasn't been finalized because of the Consolidated Appropriations Act issued from Congress in December. Congress said that those regulations may not be finalized. So there's no way that the court could order the regulations to be finalized because Congress said that appropriations may not be used to finalize those appropriations. It doesn't look quite as moot when we consider that, does it? Well, it's moot in the sense that there's no belief that the district court could provide. Well, it's moot in the sense that it's not capable of repetition and evading review either. You don't get mootness unless you confess that day. That's correct, and it's not reasonable to expect that the IRS is going to go back to the old procedures that have now been abandoned. Is the IRS behaving like an agency that we should trust? Have they been behaving like that? Yes, I think they have. Since the TIGTA report, I believe that that... At this point, we're just assuming that the allegations of the complaint are true. Are we supposed to do this? We do, but that's historically what happened between 2010 and 2013. Since then, in the PATH 4 report, which was issued just weeks after the 2013 TIGTA report, the IRS embraced all of TIGTA's recommendations, said we're adopting more procedures to correct our processes. Was it correct that a suspension was until further notice? No, the BOLO listing has been eliminated. TIGTA pointed that out in the 2015 report on the Highlights page. As far as the use of the inappropriate criteria on the BOLO list before it was eliminated, that was eliminated back in 2012 according to the report that's actually attached to the complaint, and TIGTA has confirmed that in the 2015 report on pages 3 and 4 of the report, and it has been formalized in the Internal Revenue Manual. We cited Section 7 in the reply brief. They didn't address this, and I can just read what it says throughout the Internal Revenue Manual. In that section, it says, caution, review cases based on the activities of an organization, not on words or names or labels. This is something that the IRS has repeated throughout the procedure to make sure that the problems that occurred prior to the TIGTA report are not repeated. Wouldn't it be easier to conclude that the IRS survived the capable repetition yet evading review court if IRS would display a bit more contrition about what it's done in the past? I mean, the court would have to be awfully ignorant not to recognize that there has likely been an egregious violation of the First Amendment rights of American citizens by the IRS, and the IRS, to this day, seems very resistant to acknowledgment of that. Am I mischaracterizing that? I think you have, Your Honor, and since the IRS has acknowledged that there, and if you read the PATH-4 report, a linked report, identifying and admitting that it was inappropriate to use that criteria, it was inappropriate to have the substantial delays, TIGTA did… Are you familiar with the Z Street case? Yes, I've read that decision. You know what we confronted in that? The IRS admitted that when Z Street sued them, they quit working on processing Z Street's applications. They came to court not having done anything to eliminate what they had done in Z Street and admitted that they had set it aside. They didn't even process the application after that. It's just hard to find the IRS to be an agency we can trust, isn't it? Well, what happened in Z Street and what's happened with the two pending applications in this case is pursuant to a longstanding revenue procedure. It dates back to the 60s. It's a neutral policy that when an applicant files a suit, further administrative proceedings are suspended. But in this case, the IRS and the Department didn't just do nothing, Your Honor. The Department instructed the IRS, if you have any pending applications that you can work on without further interactions with the taxpayer, without further administrative proceedings, please do so. And they did so. And during the pendency of this lawsuit, eight applications were granted. And if they were not in Z Street, why not touch? I can't speak to what happened in Z Street, but I can speak to what's happened here. And in addition, any pending applicant was offered the opportunity to participate in one of the IRS's new reforms, which is this expedited self-certifying process, which is if they can say, this is a safe harbor, that at least 60% of their activity is for social welfare and less than 40% is for political activity, then the application will be granted. That was offered. That was not accepted. So TIGTA recognized in its follow-up report that there were still a few pending applications that had not been acted on because of longstanding procedure of the litigation hold, and TIGTA nevertheless found that adequate corrective actions had taken place to expedite the applications that TIGTA had reviewed during its audit. And one last comment I would say on the mootness point is that I do think that the mootness determination shows that the system set up by Congress Works that set up TIGTA to be there to respond to complaints by taxpayers who felt that they weren't being treated fairly. TIGTA did an exhaustive audit, made numerous findings, numerous recommendations to the IRS, and the IRS responded enthusiastically. If you read the chart path forward report, the path forward report, it said mistakes were made and we're going to adopt every one of these procedures, and then TIGTA went back in and confirmed that those procedures had, in fact, all been adopted. Yes, Mr. Hagley. The longstanding policy of suspending proceedings when a lawsuit has been filed, it's referenced in the briefs as well, but the source is not cited. Can you tell us what that is? It's a revenue procedure that gets updated every year. I could provide it to the court. Would you please? Yes, yes. Yes, absolutely. Provided the most recent. Yes, I'll do that. And have you said anything about the going for vagueness claim? This has to do with the 501c4 reg and the 86 revenue Ref Proc, and the court didn't address it. The regulation was issued in 1959 and the Ref Proc is from 1986, so it's clearly not part of the alleged targeting scheme which plaintiffs say was implemented in 2010. And the court did not address these. It's more like the background against which this occurs. It's the background, but these are the substantive procedures for determining whether an applicant meets the requirements for tax exemption or not. And plaintiff had represented that it's a challenge to these old rules based on the adoption of the alleged targeting scheme procedures. So once the court determined that those procedures had been abandoned, the entire claim was moved. In addition, plaintiff does not have standing to challenge those substantive standards because they've not been injured by those substantive standards. No application has been denied under those standards. And unless and until an applicant experiences that, has no standing to challenge it. Once they do, they can bring a 7428 proceeding like the situation in this court's big mama rag where an applicant had denied exemption under a regulation. The court then in that context addressed whether the regulation was void for vagueness. I'm not sure I followed that. You're saying no application was denied under 26 CFR 1501C4-1? Correct. I thought that established the background against which all of these applications were processed, some approved, some not, and eventually more approved. Those are the substantive standards. The problems that I take to identify from why there was a delay is because of lack of training of how to apply these standards. I take to make three recommendations for training. And the complaint is that the delay traces also to the vagueness of the regulation. That's correct. But part of the complaint is the TIGTA report, which amplifies the complaint. But, again, they wouldn't have standing to, I mean, now that the procedures, I mean, TIGTA has found that the procedures that caused the delay have been changed, and now it's just these preexisting standards. And until those standards have been applied, none of the plaintiffs have standing to claim they've been injured by the standards themselves. And, again, IRS has said that. What is it that's been held up by the appropriations writer? Any work on finalizing the regulations. What Congress directed the IRS to do is to follow the regulations that were in effect in 2010, which are the very regulations that taxpayer has been complaining, or applicants have been complaining about. So this is getting more confusing rather than less. So the old allegedly vague regulation is out there. The new regulation is in draft but is on hold because of an appropriations writer. But, nonetheless, internally staff has been instructed in what is in substance the new regulation. Is that what you're saying? No. Staff has been instructed, not just on the regulation, but there's case law that interpreted the regulation as well as revenue rulings that apply the regulation to fact-specific circumstances. And a couple of these revenue rulings. That's the existing law standing regulation. That's what they call the facts and circumstances. Exactly, the facts and circumstances test. Which would be displaced by the new regulation. I believe so. Or the new regulation could provide more guidance. I'm not getting what's changed. The old regulation is there. Right. And you're saying it's not that the staff's been told to adhere to the criteria in the new regulation. So what is it that's changed? What is the training that you're talking about? Right. What TIGTA found is that the problems with the IRS procedures were due to two things, failure of management oversight and failure of employee training. And three of TIGTA's recommendations went to training. But they also found that there was a problem with this old regulation, didn't they? Well, it found that the IRS should recommend to Treasury that new regulations be adopted to clarify the situation, not that there was necessarily a problem with the old one, but it would be helpful to have a new regulation. IRS has already taken that step. It made the recommendation to the Treasury Department. Treasury started to work on new regulations and has been halted by Congress. Again, it's not any relief that the applicants could proceed from the district court because the district court can't trump the appropriations restriction. No, I understand you can't get the regulation out. Right. But that also leaves me wondering how much has really changed. Right. Any further questions? No. We might want to give her a minute or two to speak to the Bivens. I don't represent the Bivens Council. I'm sorry. All right. Thank you. My bad. Good morning and may it please the Court. Kim, the United States on which the district court relied, controls the claims against the individual defendants. In Kim, this court declined to extend Bivens to constitutional claims against IRS employees, holding, consistent with courts of appeals around the country, that it was precluded from doing so because the Internal Revenue Code provided a comprehensive remedial scheme. What plaintiffs here are asking this court to do is what neither the Supreme Court nor any court of appeals, including this court, has ever done, to extend the disfavored Bivens damages action to claims against IRS employees for the IRS's handling of tax-exempt applications. Bivens is an extraordinarily rare action. The Supreme Court has only extended it twice since Bivens itself and has refused to expand Bivens to any new context for 35 years. The Supreme Court has never held that Bivens extends to First Amendment claims of any sort, and this court has not recognized a new Bivens claim in almost 40 years. Precedent does not support any extension here. The Internal Revenue Code is a comprehensive remedial scheme that counsels hesitation in the creation of a Bivens remedy. Congress provided elaborate and detailed remedies for a broad range of IRS actions in the Internal Revenue Code, including remedies for applicants for tax-exempt status and a number of other causes of action relating to the administration of the code. Here, plaintiffs' alleged constitutional violations occurred in the course of the administration of the code. As the district court said, if not for the Internal Revenue Code, the plaintiffs could not have even sought tax-exempt status in the first place. Plaintiffs have a remedy under the code. If it weren't for that, they wouldn't have needed it. If there were no Internal Revenue Code, they wouldn't have needed it. That's true, but there is an Internal Revenue Code. Right, there is. Exactly. So what was your point in saying if it weren't for the code, they couldn't have sought it? Well, the plaintiffs have said that their claims arise outside of the code, but, in fact, they have remedies under the code. And so the code would have restored their statutory benefits if they had been unlawfully delayed or denied. They also can sue for a declaratory judgment on their eligibility, as they, in fact, did. And even if plaintiffs were right that, as counsel said, the viewpoint discrimination is not addressed by the code, that's not the relevant inquiry. Under the long line of cases from both the Supreme Court and this Court, hesitation is warranted whenever there is a comprehensive remedial scheme, whether it provides a complete remedy or any remedy at all for the plaintiff's specific harms. The Bivens analysis does not turn on the nature of the alleged conduct, but on the remedial scheme itself. So failure to provide plaintiffs with relief does not make it less comprehensive. The focus is on the statute, not the claim. In Davis v. Billington, this Court said that if the design of the statutory scheme shows that Congress's judgment that remedies are adequate, then failure to provide a particular remedy to a particular plaintiff does not make the scheme any less comprehensive for purposes of the Bivens analysis. Bush v. Lucas was quite clear on this point, saying, the question is not what remedy the Court should provide for a wrong that would otherwise go unredressed. It is whether an elaborate remedial scheme that has been constructed step by step with careful attention to conflicting policy considerations should be augmented by the creation of a new judicial remedy for the constitutional violation at issue. The code here is an elaborate remedial scheme, thus it's for Congress to decide whether to provide an individual damages remedy for constitutional violations. Congress here has decided. In the wake of precisely the allegations in this lawsuit, the targeting of Tea Party organizations by the IRS, both houses of Congress conducted hearings for more than two years, took extensive testimony. Congress amended the code in December 2015, extending Section 7428 declaratory relief to 501c4 applicants. But it did not create a damages remedy against individual IRS employees or even address the types of claims that plaintiffs have asserted here. And before that, in the late 1980s, Congress twice explicitly rejected a damages remedy for the injuries the plaintiffs allege. In fact, the staff summary that was referenced earlier actually supports the defendant's argument. It said there that Bivens does not extend to every tort by a federal agent. And the summary had included all the special factors that courts often invoked in refusing damages remedies against IRS employees. So plaintiffs here had a statutory remedy, just as in Schweiker, where the only remedy was restoration of a statutory benefit, even though the Supreme Court held that such remedy precluded Bivens' expansion because it meant plaintiffs would not be compensated for pain and suffering, emotional distress, and terrible harms that they had suffered due to unconstitutional delay. Nevertheless, that remedial comprehensive scheme precluded the expansion of Bivens, and the same results should apply here. The fact that plaintiffs have to grasp at a case like Munsell, which ultimately did not even decide Bivens, shows that there's no real precedent under either the Supreme Court's cases or this Court's cases to extend Bivens to this context. Thank you, Ms. Bethis. Thank you. I feel like I have quite a bit to cover in two minutes. So first of all, I think it's important to note that the government has now acknowledged here today that the district court did not even address the facial challenges to the C-4 regulation and the C-3 revenue procedure. That in and of itself is an error and should be remanded in reverse for consideration of those claims. Second, this is a motion to dismiss. So the attempt to insert new facts at this stage is wholly improper. They should not be inserted at this time. They should not be relied upon at this time. So trying to refute the allegations in the complaint that the reason that these plaintiffs, particularly the two who are waiting, the reason that they are still waiting and being delayed is because they were rounded up, swept up in this targeting scheme. Whatever facts the IRS may think, refute, or dispute that are more properly asserted at the summary judgment stage. They're not facts that are in the complaint, and they should not be considered here. Essentially, their position is just trust us. We're doing the right thing now. It has been over five years for these plaintiffs. It is a difficult pill to swallow for them to be told just trust us from this particular agency. The expedited process that was raised, the expedited process is a process by which an organization can voluntarily give up more of its constitutional rights. Again, just trust us, though. Three of the nine TIGTA recommendations, the government relies heavily on the TIGTA report and the follow-up report. The follow-up report says that, crucially, one of the things that they have failed to do thoroughly is to train the very individual employees who are handling these EO applications. There's other information. Which version of the report is that? The 2015 report. March 2015? Yes, Your Honor. It notes that three of the nine recommendations have not been satisfied to TIGTA's satisfaction. And TIGTA actually isn't the standard here, but apparently we're going to make TIGTA the standard if the government has its way here. But even by TIGTA's standards, they're not satisfied. Where does that appear in the report? I believe in the high, if I'm not incorrect, Your Honor, I believe it's in the highlights section, but I know that further down they do talk about the fact, I think it's 46% of those individuals who were supposed to receive the training didn't receive the full training. They didn't show up on time. They're not being monitored. Part of the excuse for this entire scheme was management wasn't doing its job. Well, apparently it's still not doing its job because it's not monitoring and making sure that those who TIGTA has said need to be properly trained are being properly trained. There are ongoing problems. This TIGTA report, as I recall, was limited to, yes, to the application process. It was. Not to any subsequent. No, it was limited to that part of the targeting scheme. The GAO report, Your Honor, which through the vote I know we'll talk about more when they argue and they cited and relied on in their briefs. The GAO concluded in 2015 that there is actually a heightened risk for these very organizations that have been targeted based on their viewpoints, their political viewpoints, to be selected on that same basis for examination. In fact, finding that the very reason that the IRS says they were initially targeted was because they were getting media attention. The criteria that supports GAO's finding that they're more likely to be subjected to examination is because they've been getting media attention. So it's a vicious cycle. They're not getting out of it. They are in the pen. They've been branded. And there's no way for them to get out of this at this time. And, unfortunately, trust us from the IRS is just not sufficient. It's not sufficient for mootness or to satisfy these plaintiffs. I want to take you back to your point about inspection and disclosure. Yes, Your Honor. In what meaningful sense is that distinct from the illegal collection? The collection is the demands for the information. They were told, you give us this information. If you don't give it to us by this date, we will administratively close your file. You will lose the right to seek a remedy after this. So they were demanded to give the information. That was one precise action. Is there an allegation in the complaint, or the amended complaint, to the effect that the inspection and disclosure occurs separately from the collection? I believe that in the paragraphs, the way it's worded, it's a series. It's separated by commas, but that they obtained it, handled it. Where in the complaint is it? In paragraphs. I know in the legal complaint, I mean, in the legal claims, we set that out, and that's claim seven, I believe it is. I can point you to that. If you look at Appendix 82, Paragraph 419, we say that the additional information demanded was illegally obtained, inspected, handled, and disclosed. Additionally, throughout the complaint, in addition to detailing the type of information that was unnecessary, we provided every date on which a plaintiff was demanded to produce the information,  What was the paragraph number of the series you stated at the moment that ended with the word disclosed? 419, Your Honor. 419, okay. Appendix 82. But again, the point being that we have identified every date on which it was demanded of them, every date on which they produced the information, obvious and eminently reasonable inferences that, as we then alleged later, it was improperly inspected. Apart from the two C-4 applications that are pending, as to which your claim is of continuing delay and so on, what have you alleged by way, if you have, of reputational or other harms that have continued to affect all of the applicants, even those that have been subsequently approved? Your Honor, we have alleged Paragraph 315 is a specific example I can give you, but that there is a chilling effect on their associational rights in that grantors and donors Continuing? How does that continue? Well, it continues in a couple of ways. One, until there is assurance from grantors and donors that these are C-4 organizations, they will not have anything to do with them. Well, that's back to the two who are still pending. Right. I'm sorry. And for those that have already been granted, it is the fact that grantors and donors know that they were swept up in this targeting scheme and know of the ongoing facts that are coming to light every day. That's a bit more than you allege in Paragraph 315. Oh, I'm sorry, Your Honor. 315 is... It has had a chilling effect. That's... Has had... That's the end of Paragraph 315. That's correct, Your Honor. It does not allege an ongoing harm, does it? Well, it certainly is the intention to allege that this is an ongoing, that this is much more, again, back to Paragraph 4, when we talk about the continued monitoring, that obviously has a chilling effect on them, knowing that they are part of this group that has been identified, they're being watched solely because of their political viewpoints. That certainly is part of the ongoing overall targeting scheme that demonstrates that it is not limited solely to this application process, but, in fact, goes beyond that. And, again, I think it is imperative that the Court understand many of the specific facts about the way that it is ongoing have come to light since the filing, not only of the filing of the Second Amendment complaint, but since the decision on the motion to dismiss. So it may be that there's an amendment that's due, but I believe that we have satisfied the standard. We have said enough to demonstrate that this is ongoing, that they are continuing to be harmed because of having first been rounded up in the scheme. Is that your best allegation that you can give us today of ongoing harm? I believe that Paragraph 4 and 315 together are the best. And, again, Your Honor, on a motion to dismiss, all reasonable inferences are to be drawn in favor of the plaintiffs. And I think it is certainly reasonable to infer here that the continued monitoring, the chilling effect, that those are allegations of a broad-ranging targeting. One more fairly simple question. What was the citation to the Sixth Circuit case you cited at the beginning of your opening? I looked for it in the brief and didn't find it. Well, no, it actually came out just about a week and a half ago, Your Honor. And I apologize, I may not have that in front of me. You should have made it. That's okay. I will submit that, Your Honor. In Paragraph 4, you say, and are still suffering financial harm. Right. And that's from the unwillingness of donors and grantors to associate with them. So that also relates simply to the two that still have not received. I think, yes, it's in the sentence beginning, regarding to those that have not yet received final determinations. Again, it applies very heavily to them, for sure. I mean, obviously to them. But, again, it applies to all of them to the extent that others are unwilling to associate with them knowing that they are a part of this. If I donate to you, then am I going to become part of this as well? They're continuing to watch operations. Again, this review of operations that organizations know nothing about. They don't get a notice of that, but the operations are being reviewed. And so if there are donors to that and the IRS decides, okay, well, we want to target them as well because of their affiliation, that is an ongoing harm that, as you point out, has clearly been alleged here. Further questions? Thank you, Ms. Gamble. Thank you all. Counsel, the case is submitted.
judges: Henderson, Ginsburg, Sentelle